1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

DEFORGE MARITIME TOWING,
LLC, et al.,

CASE NO. C20-1085JLR

11

ORDER

Plaintiffs,

12

v.

13

ALASKA LOGISTICS, LLC, et al.,

14

Defendants.

15

16

## I.   INTRODUCTION

17

Before the court are:  (1) Defendant Alaska Logistics, LLC ("AL") and Allyn G.

18

Long's (collectively, "Defendants") motion for partial summary judgment (Defs. MSJ

19

(Dkt. # 27); Defs Reply (Dkt. # 38)); and (2) Plaintiffs DeForge Maritime Towing, LLC

20

("DMT") and Double EMC Marine, LLC's ("Double EMC")[1] motion for partial

21

22

---

[1] Although DMT and Double EMC jointly filed a motion for partial summary judgment,
Double EMC was dismissed from this case shortly after the parties filed their motions.  (*See
generally* Pls. MSJ; Dkt.; 2/12/22 Order (Dkt. # 33); Stip. (Dkt. # 32).)  Because Double EMC is

summary judgment (Pls. MSJ (Dkt. # 30); Pls. Reply (Dkt. # 39)).  Each party opposes

the other's motion.  (Defs. Resp (Dkt. # 34); Pls. Resp. (Dkt. # 35).)  The court has

considered the motions, the parties' submissions in support of and in opposition to the

motions, the relevant portions of the record, and the applicable law.  Being fully advised,[2]

the court DENIES DMT's motion for partial summary judgment and GRANTS in part

and DENIES in part Defendants' motion for partial summary judgment.

## II.    BACKGROUND

This admiralty action arises out of a contract dispute between DMT and AL

regarding the parties' 2018 and 2019 "Time Charter Agreements" (collectively, the

"Time Charter Agreements" or the "Agreements").  (*See generally* Am. Compl. (Dkt.

# 17); DeForge Decl. (Dkt. # 31) ¶ 5, Ex. 1 ("2018 Time Charter Agreement"); *id.* ¶ 8,

Ex. 4 ("2019 Time Charter Agreement").[3])  DMT is a tug and barge company that

provides services in the western United States, including carriage, transportation,

chartering, and vessel transport.  (*See* DeForge Decl. ¶ 2.)  AL is a marine transportation

company that provides services in Western Alaska and the Arctic.  (*See* Park Decl. (Dkt.

# 29) ¶ 2, Ex. A ("Long Dep.") at 9:10-18.)

//

no longer a party to this case, the court refers to the pleadings submitted by both Double EMC
and DMT, as well as the claims contained in the amended complaint, as DMT's alone.

[2] Neither party has requested oral argument (*see* Defs. MSJ at 1; Pls. MSJ at 1), and the
court has determined that oral argument would not be helpful to its disposition of the motions,
*see* Local Rules W.D. Wash. LCR 7(b)(4).

[3] Unless otherwise indicated, the court uses the CM/ECF page numbers when citing to
the parties' pleadings and exhibits.

1  **A.      The 2018 Time Charter Agreement**

2          In 2018, DMT and AL began discussing the possibility of AL chartering tugs and

3  barges from DMT for use in AL's Alaska transport operations.  (*See* DeForge Decl. ¶ 3.)

4  AL and DMT ultimately entered into a time charter agreement (the "2018 Time Charter

5  Agreement") for the charter of the barge THELMA 302 (the "THELMA")[4] and two

6  DMT tugs (collectively, the "vessels") on May 9, 2018.  (*See* 2018 Time Charter

7  Agreement; DeForge Decl. ¶ 5; *see also* Long Dep. at 11:10-17 (stating that the

8  THELMA was larger than the barges owned by AL and thus more useful for longer

9  journeys).)

10         The 2018 Time Charter Agreement described the vessels to be chartered, the

11 on-hire and off-hire dates for the vessels, and the price terms.  (*See, e.g.*, 2018 Time

12 Charter Agreement ¶ 1.1.)  In addition, the agreement provided that, "subject to [AL]'s

13 general direction, [DMT] shall have exclusive control and command of the Vessels'

14 operation and navigation," while AL would be in control of loading and unloading cargo

15 and similar operations.  (*See id.* ¶¶ 1.1, 2.8.)  The parties also agreed that the agreement

16 would be governed "first by the General Maritime Law of the United States and second

17 by the laws of the State of Washington, insofar as applicable."  (*See id.* ¶ 12.4.)

18         Under the terms of the 2018 Time Charter Agreement, AL, with the permission of

19 DMT, was permitted to install additional equipment on and make alterations to the

20

21         [4] Double EMC, a Washington barge company, is the registered owner of the THELMA.
(*See* Park Decl. ¶ 3, Ex. B ("Edwards Dep.") at 14:4-9, 20:24-25:1.)  During the times relevant to

22 this case, DMT "[b]areboat chartered" the THELMA from Double EMC for the purposes of
using and chartering the barge for its business.  (*See id.* at 24:7-18.)

chartered vessels.  (*Id.* ¶ 3.1.)  The agreement provided, however, that "[t]he On-Hire

Period for each Vessel shall not end until [AL], at its sole cost and expense, removes all

such equipment, materials and gear, and restores each Vessel to its condition prior to

making such changes, ordinary wear and tear excepted."  (*Id.*)  The agreement also

addressed redelivery of the vessels and defined the end of the charter period, stating that

"[t]he Vessels shall be redelivered to [DMT] upon termination of the On-Hire Periods

applicable thereto at [DMT's] home port in Seattle, Washington, or other such other

location as agreed between the parties, in the same order and condition, ordinary wear

and tear excepted, as when accepted by [AL]."  (*Id.* art. 5.)

        The 2018 Time Charter Agreement also imposed specific duties and liabilities on

AL regarding its handling of the chartered vessels.  For example, DMT and AL agreed to

the following:

>       2.7 [AL] shall not at any time ground the THELMA.  Any damage to the
>       THELMA caused by grounding while in the sole control of [AL] will be at
>       the sole expense of and for the sole account of [AL].
>
>       . . . .
>
>       2.9 [AL] will ensure that there is adequate fendering at all moorage facilities.
>       Any damage resulting to any of the Vessels arising from [AL's] failure to do
>       so will be for the sole account of [AL].

(*Id.* ¶¶ 2.7, 2.9.)  The parties also executed an addendum to the 2018 Time Charter

Agreement, which transferred liability for damage to the THELMA as a result of the

condition of the berth or loading or unloading cargo to AL:

>       1. [AL] shall direct the Vessels to and between safe ports.  [AL] shall be
>       responsible for any loss or damage sustained by any of the Vessels by reason
>       of the condition of berth or offshore unit.

2. Notwithstanding the provisions of Article 8, [AL] shall be responsible for loss or damage to any Vessel caused by the loading or unloading of any cargo.

(*Id.* at Addendum ¶¶ 1-2.[5])

The parties also agreed to a system for determining the condition of the chartered vessels at the time of "on-hire" and "off-hire." (*Id.* ¶ 4.1.) The agreement called for an agreed-upon qualified surveyor to conduct an on-hire survey prior to the charter period, as well as an off-hire survey, which is "an equivalent survey by the same surveyor," at the termination of the charter hire. (*Id.*) The agreement further provided that the on-hire survey "shall be conclusive evidence of the condition of the Vessel as of the date of commencement of the period of hire" and the off-hire survey "shall likewise be conclusive evidence of the condition of the Vessel as of the termination of the applicable On-Hire Period." (*Id.*)

The parties' relevant liability and indemnity obligations were set forth in paragraphs 8.1 through 8.4 of the 2018 Time Charter Agreement.[6] Regarding loss or damage to DMT's property, including the THELMA, paragraph 8.1 provided as follows:

8.1 [DMT] shall defend, protect, indemnify, and hold harmless [AL] from and against any loss, cost, claim, obligation to indemnify another, suit, judgment, award, or damage (including reasonable attorneys' fees), including, but not limited to, wreck removal, on account of loss or damage to any of the Vessels, [DMT's] equipment and vessels, either owned, rented

---

[5] The addendum also provided for AL to obtain insurance at a certain amount. (*See* 2018 Time Charter Agreement at 12.)

[6] In addition to these four paragraphs, article 8 of the 2018 Time Charter Agreement included other liability and indemnity obligations that do not affect the court's disposition of the instant motions. (*See generally* 2018 Time Charter Agreement art. 8.)

> and operated by [DMT] or its agents, subcontractors, and invitees, arising out of or relating to the performance of the work or services under this Charter, whether caused or brought about by [AL's] negligence or any other theory of legal liability, including strict liability or the unseaworthiness of any vessel.

(*Id.* ¶ 8.1.)  Similarly, paragraph 8.2 provided that "[DMT] shall defend, protect, indemnify, and hold harmless [AL]" from any loss, cost, claim or damage "on account of any illness, injury, or death, suffered by [DMT]'s employees . . . arising out of or relating to the performance of the work or services under this Charter."  (*Id.* ¶ 8.2.)  Regarding loss or damage to AL's property, paragraph 8.3 provided as follows:

> 8.3 [AL] shall defend, protect, indemnify and hold harmless [DMT] from and against any loss, cost, claim, obligation to indemnify another, suit, judgment, award, or damage (including reasonable attorneys' fees), on account of loss or damage to any of [AL's] equipment and vessels, either owned, rented and operated by [AL] or its agents, subcontractors, and invitees, arising out of or relating to the performance of the work or services under this Charter, whether caused or brought about by [DMT's] negligence or any other theory of legal liability, including strict liability or the unseaworthiness of any vessel.

(*Id.* ¶ 8.3.)  Similarly, paragraph 8.4 provided that "[AL] shall defend, protect, indemnify, and hold harmless [DMT]" from any loss, cost, claim or damage "on account of any illness, injury, or death, suffered by [AL's] employees . . . arising out of or relating to the performance of the work or services under this Charter."  (*Id.* ¶ 8.4.)  Notwithstanding the parties' liability and indemnity obligations, the 2018 Time Charter Agreement stated that neither party is entitled to recover from the other party any indirect, consequential, or special damages, including "loss of profits, loss of use, loss of hire, or loss of production."  (*Id.* ¶ 8.9.)

//

ORDER - 6

**B.     The 2019 Time Charter Agreement**

In May 2019, DMT and AL entered into a second time charter agreement (the "2019 Time Charter Agreement") for the charter of the THELMA and three DMT tugs (collectively, the "vessels").  (*See* 2019 Time Charter Agreement; *see also* DeForge Decl. ¶ 8.)  The 2019 Time Charter Agreement contained many of the same provisions as the 2018 Time Charter Agreement.  For example, it included the same liability and indemnity provisions (*compare* 2019 Time Charter Agreement ¶¶ 8.1-8.4, *with* 2018 Time Charter Agreement ¶¶ 8.1-8.4);[7] additional equipment/alterations and end of charter provisions (*compare* 2019 Time Charter Agreement ¶ 3.1 & art. 5, *with* 2018 Time Charter Agreement ¶ 3.1 & art. 5); disclaimer of special, indirect, or consequential damages (*compare* 2019 Time Charter Agreement ¶ 8.9, *with* 2018 Time Charter Agreement ¶ 8.9); choice of law provision (*compare* 2019 Time Charter Agreement ¶ 12.4, *with* 2018 Time Charter Agreement ¶ 12.4); and system for determining the condition of the chartered vessels at the time of "on-hire" and "off-hire" (*compare* 2019 Time Charter Agreement art. 4, *with* 2018 Time Charter Agreement ¶ 4.1).

---

[7] The language in paragraph 8.3 differs slightly between the two Time Charter Agreements because paragraph 8.3 in the 2019 Time Charter Agreement included this additional language:

8.3 . . . Further, notwithstanding anything to the contrary in Article 8, [AL] shall additionally defend, protect, indemnify and hold harmless [DMT] from and against any loss, cost, claim, obligation to indemnify another, suit, judgment, award, or damage (including reasonable attorneys' fees), on account of loss or damage to any Vessel caused by the loading or unloading of any cargo.

(2019 Time Charter Agreement ¶ 8.3.  *Compare id.*, *with* 2018 Time Charter Agreement ¶ 8.3.)

The 2019 Time Charter Agreement described the vessels to be chartered, the on-hire and off-hire dates for the vessels, and the price terms.  (*See, e.g.*, 2019 Time Charter Agreement ¶¶ 1.1-1.3.)  The agreement maintained the same description of AL and DMT's respective roles as the 2018 Time Charter Agreement, stating that, "subject to [AL's] general direction, [DMT] shall have exclusive control and command of each Vessel's operation and navigation," while AL would be in control of loading and unloading cargo and similar operations.  (*See id.* ¶¶ 1.4, 2.7.)

As with the 2018 Time Charter Agreement, the 2019 Time Charter Agreement imposed specific duties and liabilities on AL related to its handling of the vessels:

> 1.5 [AL] shall direct the Vessels to and between safe ports.  [AL] shall be responsible for any loss or damages sustained by any of the Vessels by reason of the condition of ~~port or~~ berth.
>
> . . . .
>
> 2.7 . . . Notwithstanding the insurance and indemnity provisions of this Charter, [AL] shall be responsible for loss or damage to the THELMA caused by the loading or unloading of any cargo performed by [AL's] personnel, agents, or parties in contract with [AL] without the right to make claim against [DMT] except in cases of gross negligence or willful misconduct.
>
> . . . .
>
> 3.2 [AL] will ensure that there is adequate fendering at all moorage facilities. Any damage resulting to any of the Vessels arising from [AL's] failure to do so will be for the sole account of [AL].
>
> 3.3 Notwithstanding the insurance and indemnity provisions of this Charter, all deductibles damages, loss, risk, cost, liability, and expense (collectively 'Damages') arising from or related to any grounding of the THELMA, regardless of fault, shall be for [AL's] account . . . .

(2019 Time Charter Agreement ¶¶ 1.5, 2.7, 3.2, 3.3 (strikethrough in original).)

1    **C.    Alleged Damage to the THELMA During the 2018 and 2019 Charters**

2        The parties agreed to use marine surveyor Mark McElwaine to conduct the 2018

3    and 2019 on- and off-hire surveys of the THELMA, as provided for in the Time Charter

4    Agreements.  (*See* DeForge Decl. ¶¶ 6-7, 9-10, Exs. 2-3, 5-6; *see also* 2018 Time Charter

5    Agreement ¶ 4.1; 2019 Time Charter Agreement art. 4.)  When Mr. McElwaine

6    performed the 2018 and 2019 on-hire surveys, he noted that the THELMA had extensive

7    preexisting damage to certain structures.  (*See* DeForge Decl., Exs. 2, 5.)  Despite the

8    preexisting damage to the THELMA, Mr. McElwaine's 2018 and 2019 off-hire surveys

9    identified several areas of "new" damage that the THELMA allegedly sustained during

10   the respective charter periods.[8]  (*See id.*, Exs. 3, 6.)  His off-hire surveys, however, did

11   not identify the cause(s) of the "new" damage.  (*See generally id.*)

12       Because the parties disputed who was liable for the alleged 2018 and 2019 damage

13   to the THELMA under the terms of the Time Charter Agreements (*see generally* Am.

14   Compl.; Pls. MSJ at 7; Defs. MSJ at 12), DMT commenced this action in July 2020,

15   asserting claims for breach of contract, account stated, and negligence against Defendants

16   (*see generally* Compl. (Dkt. # 1); Am. Compl. (adding Double EMC as a Plaintiff)).  In

17   its negligence claim and a portion of its breach of contract claim,[9] DMT seeks to recover

18

19       [8] Defendants dispute the reliability of Mr. McElwaine's findings, but do not dispute, for
     the purposes of these motions, that the "items identified on the off-hire surveys were 'new
20   damage.'"  (*See* Defs. MSJ at 7 n.5, 18; Defs. Resp. at 1 n.1.)

21       [9] In its breach of contract claim, DMT also requests a monetary sum, seemingly unrelated
     to the costs associated with the barge damage, for the "principal, interest and late fees" owed on
22   two unpaid invoices for services that DMT provided under the Time Charter Agreements and for
     reimbursement of expenses for such services.  (*See* Am. Compl. at 2-5.)

1    a monetary sum for the damage that the THELMA sustained during the charter periods.

2    (*See* Am. Compl. at 3-5.)  In calculating the sum owed for the damage, DMT included the

3    costs of repairs and daily charter hire for the days required to repair the THELMA.  (*See*

4    *id.*; Edwards Decl. (Dkt. # 36) ¶¶ 13-14 (describing the costs DMT is claiming for

5    damage to the THELMA and charter hire); Park Decl. ¶ 11, Ex. J (setting forth DMT's

6    barge damage calculations).)

7                          **III.    ANALYSIS**

8            Defendants move for partial summary judgment in their favor on DMT's barge

9    damage claims, which they characterize as DMT's claims for negligence and/or breach of

10   contract insofar as the claims request relief related to the damage to the THELMA.  (*See*

11   Defs. MSJ at 2, 13, 17.)  They ask the court to dismiss the barge damage claims in their

12   entirety or, alternatively, dismiss the portions of them in which DMT seeks to recover

13   charter hire.  (*See id.*)  Defendants also ask the court to dismiss the claims asserted

14   against them by Double EMC because it is not a proper party to this dispute.  (*See id.* at

15   18-19.)  DMT opposes Defendants' motion (*see generally* Pls. Resp.) and cross-moves

16   for partial summary judgment in its own favor on its barge damage claims with respect to

17   the issue of liability for the damage to the THELMA.  (*See* Pls. MSJ at 1-2, 7-12.)

18   Below, the court sets out the relevant legal standards before turning to consider the

19   parties' arguments in favor of their respective motions for partial summary judgment.

20   //

21   //

22   //

1    **A.    Legal Standards**

2        The court sets out the standard of review that applies to its consideration of

3    cross-motions for summary judgment before discussing the legal standards governing the

4    interpretation of maritime contracts.

5        1.  Summary Judgment

6        Summary judgment is appropriate if the evidence viewed in the light most

7    favorable to the non-moving party shows "that there is no genuine dispute as to any

8    material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

9    56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it

10   might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

11   (1986). A factual dispute is "'genuine' only if there is sufficient evidence for a

12   reasonable fact finder to find for the non-moving party." *Far Out Prods., Inc. v. Oskar*,

13   247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

14       The moving party bears the initial burden of showing there is no genuine dispute

15   of material fact and that it is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at

16   323. If the moving party does not bear the ultimate burden of persuasion at trial, it can

17   show the absence of such a dispute in two ways: (1) by producing evidence negating an

18   essential element of the nonmoving party's case, or (2) by showing that the nonmoving

19   party lacks evidence of an essential element of its claim or defense. *Nissan Fire &*

20   *Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party

21   meets its burden of production, the burden then shifts to the nonmoving party to identify

22   specific facts from which a factfinder could reasonably find in the nonmoving party's

favor. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.  Where cross motions are at

issue, the court must "evaluate each motion separately, giving the nonmoving party in

each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las*

*Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006); *Tulalip Tribes of Wash. v. Washington*, 783

F.3d 1151, 1156 (9th Cir. 2015) ("[W]hen simultaneous cross-motions for summary

judgment on the same claim are before the court, the court must consider the appropriate

evidentiary material identified and submitted in support of both motions, and in

opposition to both motions, before ruling on each of them." (quoting *Fair Hous. Council*

*of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001))).

     2.  <u>Interpretation of Maritime Contracts</u>

     A contract that relates to a ship, to commerce or navigation on navigable waters,

or to maritime employment is a maritime contract. *Brusco Tug & Barge, Inc. v. St. Paul*

*Fire & Marine Ins. Co.*, 897 F. Supp. 2d 1048, 1052 (W.D. Wash. 2012) (citing

*Sundance Cruises Corp. v. American Bureau of Shipping*, 7 F.3d 1077, 1080 (2d Cir.

1993)).  The Time Charter Agreements qualify as maritime contracts because they relate

to ships and navigation on navigable waters. *See Aqua-Marine Constructors, Inc. v.*

*Banks*, 110 F.3d 663, 671 (9th Cir. 1997) ("A charter party is clearly a maritime

contract.").

     Courts "interpret and resolve disputes concerning maritime contracts according to

federal law." *Heko Servs., Inc. v. ChemTrack Alaska, Inc.*, 418 F. Supp. 3d 656, 660

(W.D. Wash. 2019) (first citing *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23 (2004); and

then citing *Starrag v. Maersk, Inc.*, 486 F.3d 607, 616 (9th Cir. 2007)).  Courts, however,

1   may use state law to interpret maritime contracts, provided that it does not clearly conflict

2   with federal maritime law.  *Aqua-Marine Constructors*, 110 F.3d at 667-68 (citing

3   *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310 (1955)).  "Basic principles in

4   the common law of contracts readily apply in the maritime context."  *Clevo Co. v. Hecny*

5   *Transp., Inc.*, 715 F.3d 1189, 1194 (9th Cir. 2013) (noting that the Ninth Circuit looks to

6   the Restatement (Second) of Contracts to determine the basic elements of contract law);

7   *see also CITGO Asphalt Ref. Co. v. Frescati Shipping Co.*, 140 S. Ct. 1081, 1087-88

8   (2020) ("Maritime contracts must be construed like any other contracts:  by their terms

9   and consistent with the intent of the parties.").

10          Under federal maritime law, "[c]ontract terms are to be given their ordinary

11   meaning, and whenever possible, the plain language of the contract should be considered

12   first."  *Anderson v. City of Seward*, 475 F. Supp. 3d 986, 991 (D. Alaska 2020) (quoting

13   *Starrag*, 486 F.3d at 616); *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214, 1217

14   (5th Cir. 1986) (noting that courts should read maritime contracts as a whole and look

15   first to the intent of the parties as expressed by the terms of the agreement).  "Only if the

16   language is ambiguous—reasonably susceptible to more than one interpretation—should

17   a court examine extrinsic evidence and look beyond the written language of the contract"

18   to determine the intent of the parties.  *Anderson*, 475 F. Supp. 3d at 991 (citing *Fontenot*,

19   791 F.2d at 1214); *see also In re Fitzgerald Marine & Repair, Inc.*, 619 F.3d 851, 859

20   (8th Cir. 2010) ("Disagreement as to the meaning of a maritime contract does not make it

21   ambiguous, nor does uncertainty or lack of clarity in the language chosen by the parties."

22   (quoting *Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 364 (5th Cir. 2009))).  The

1    introduction of extrinsic evidence, however, injects a fact issue concerning the parties'

2    intent that generally precludes summary judgment.  *Teras Chartering, LLC v. Hyupjin*

3    *Shipping Co.*, No. C16-0188RSM, 2017 WL 2363632, at *7 (W.D. Wash. May 31, 2017)

4    (citing *Thibodeaux v. Vamos Oil & Gas Co.*, 487 F.3d 288, 294 (5th Cir. 2007)).  "When

5    the district court's decision is based on analysis of the contractual language and an

6    application of the principles of contract interpretation, that decision is a matter of law."

7    *W. Towboat Co. v. Vigor Marine, LLC*, 544 F. Supp. 3d 1100, 1116 (W.D. Wash. 2021)

8    (quoting *Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 367 (9th Cir. 1985)); *see also*

9    *Breaux*, 562 F.3d at 364.

10   **B.      Defendants' Liability for DMT's Barge Damage Claims**

11           Defendants ask the court to dismiss DMT's barge damage claims—i.e., its claims

12   for breach of contract and/or negligence—because, they assert, they are not liable for

13   such damage in light of DMT's "lack [of] evidence that the alleged damage [to the

14   THELMA] occurred as a result of a specifically delineated exception" to the Time

15   Charter Agreements' indemnity clauses.  (*See* Defs. MSJ at 13-17.)  DMT cross-moves

16   for partial summary judgment on these claims, arguing that AL is liable under the Time

17   Charter Agreements for the damage that the THELMA sustained during the 2018 and

18   2019 charter periods.  (*See* Pls. MSJ at 7-12 (noting that its motion solely focuses on

19   liability and does not address the parties' disputes regarding "the extent and severity of

20   those damages and the reasonable costs to repair").)  The court considers the parties'

21   arguments regarding the proper interpretation of the Agreements with respect to AL's

22   //

1    liability for damage to the chartered vessels before turning to Defendants' arguments

2    regarding DMT's lack of evidence as to the cause of the damage to the THELMA.

3          1.  Interpretation of the Time Charter Agreements

4          The parties agree that the Time Charter Agreements imposed liability on AL for

5    barge damage resulting from grounding, inadequate fendering, unsafe berth, or

6    loading/unloading.  (*See* Pls. MSJ at 9-10; Defs. MSJ at 15.)  The parties' disagreement,

7    however, revolves around whether the Agreements imposed liability on AL for barge

8    damage caused *only* by those specific events, or whether AL is strictly liable for *any*

9    damage that the THELMA sustained during the charter periods.  (*See* Defs. Reply at 2-6;

10   Pls. Reply at 2-4.)  Both parties maintain that the Time Charter Agreements' language is

11   unambiguous and can be interpreted in their favor on summary judgment without

12   considering extrinsic evidence.  (*See* Pls. Reply at 7; Defs. Reply at 6.)

13         DMT argues that the Time Charter Agreements required AL to "restore the

14   chartered vessels to their pre-hire condition" and "imposed responsibility on AL" for any

15   damage to the vessels during the charter periods beyond ordinary wear and tear.  (*See* Pls.

16   MSJ at 9-10.)  Its interpretation relies on the Agreements' additional

17   equipment/alterations and end of charter provisions, which provided that:  AL shall

18   "remove[] all such equipment, materials and gear, and restore[] each Vessel to its

19   condition prior to making such changes, ordinary wear and tear excepted" (2018 Time

20   Charter Agreement ¶ 3.1; 2019 Time Charter Agreement ¶ 3.1); and "[t]he Vessels shall

21   be redelivered to [DMT] . . . in the same order and condition, ordinary wear and tear

22   excepted, as when accepted by [AL]" (2018 Time Charter Agreement art. 5; 2019 Time

1    Charter Agreement art. 5).  DMT contends that its interpretation of those clauses as

2    imposing strict liability on AL for any damage to the chartered vessels is "is reinforced

3    by the clauses requiring on-hire and off-hire surveys to 'conclusively' document the

4    THELMA's condition at the start and end of the hire periods."  (*See* Pls. Reply at 2 (first

5    citing 2018 Time Charter Agreement ¶ 4.1; and then citing 2019 Time Charter

6    Agreement art. 4).)  It attempts to discount the indemnity clause contained in paragraph

7    8.1 of the Agreements, the plain text of which requires DMT to indemnify AL for

8    damage to the chartered vessels, by arguing that the clause:  (1) is merely a "general

9    provision about liability and a duty to indemnify/defend"; (2) "is clearly intended to

10   address third party suits, casualties, and related claims or costs rather than the parties'

11   liability to each other for damage caused"; and (3) "does not purport to immunize AL

12   from liability even when AL causes damage to the hired vessels during its charter."  (*See*

13   Pls. MSJ at 9-10; Pls. Resp. at 6.)

14          In contrast, Defendants characterize paragraphs 8.1-8.4 of the Time Charter

15   Agreements as containing "clear and unambiguous knock for knock indemnity clauses"

16   because they "require each party to contractually assume responsibility for injuries to its

17   own employees and damage to its own property, without regard to who caused the injury

18   or how such damage occurred."  (*See* Defs. MSJ at 14-15 (citing Daniel B. Shilliday et

19   al., *Contractual Risk-Shifting in Offshore Energy Operations*, 81 Tul. L. Rev. 1579, 1599

20   (2007)).)  They also contend that the Time Charter Agreements contain several express

21   exceptions to knock for knock indemnity under which AL could only "be liable for barge

22   damage resulting from specific causes" such as grounding, loading/unloading, inadequate

1   fendering, or unsafe berth.  (*See id.*)  Moreover, Defendants claim that the Agreements

2   cannot be interpreted as imposing strict liability on AL for any damage to the THELMA

3   because such an interpretation is not supported by the Agreements' language and would

4   render the indemnification clauses, and the specific exceptions to those clauses,

5   meaningless.  (*See* Defs. Resp. at 5-8; Defs. Reply at 5-6.)

6       The court agrees that the terms of the Time Charter Agreements are not

7   ambiguous and concludes that Defendants' interpretation of AL's obligations under the

8   Agreements in relation to vessel damage is the only reasonable interpretation.  Starting

9   with the Agreements' liability and indemnity provisions, the court notes that federal

10  maritime law requires it to construe indemnity clauses "to cover all losses, damages, or

11  liabilities which reasonably appear to have been within the contemplation of the parties,"

12  but not those "which are neither expressly within its terms nor of such a character that it

13  can be reasonably inferred that the parties intended to include them within the indemnity

14  coverage."  *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 333 (5th Cir. 1981).

15      Paragraph 8.1 of the Time Charter Agreements provided that "[DMT] shall

16  defend, protect, indemnify, and hold harmless [AL] from and against any loss, cost,

17  claim, obligation to indemnify another, suit, judgment, award, or damage . . . on account

18  of loss or damage to any of the Vessels, [DMT's] equipment and vessels . . . whether

19  caused or brought about by [AL's] negligence or any other theory of legal liability."  (*See*

20  2018 Time Charter Agreement ¶ 8.1; 2019 Time Charter Agreement ¶ 8.1.)  Similarly,

21  paragraph 8.3 provided that "[AL] shall defend, protect, indemnify and hold harmless

22  [DMT] from and against any loss, cost, claim, obligation to indemnify another, suit,

1    judgment, award, or damage . . . on account of loss or damage to any of [AL's]

2    equipment and vessels . . . whether caused or brought about by [DMT's] negligence or

3    any other theory of legal liability." (*See* 2018 Time Charter Agreement ¶ 8.3; 2019 Time

4    Charter Agreement ¶ 8.3.)  The plain language of these provisions supports Defendants'

5    interpretation of the Time Charter Agreements' indemnity clauses as establishing knock

6    for knock indemnity (*see* Defs. MSJ at 14; Defs. Reply at 2-3), meaning that each party is

7    responsible for claims arising out of or relating to its own property such that DMT is

8    barred from recouping costs from AL related to barge damage unless the damage arises

9    from an exception to the knock for knock indemnity clauses.  *See, e.g.*, *W. Towboat Co.*,

10   544 F. Supp. 3d at 1120-21 (describing the indemnity clauses in the parties' agreement as

11   knock for knock indemnity clauses and discussing their scope); *Heko Servs.*, 418 F. Supp.

12   3d at 659, 664 (discussing the parties reciprocal indemnification clauses in which

13   plaintiff "agreed to be responsible for all loss, damage, expense, liability or claims

14   applicable to the barge, even if resulting from the negligence of [the defendant], and [the

15   defendant] agreed to the same with respect to its cargo").

16          To adopt DMT's interpretation and conclude that the indemnity clause in

17   paragraph 8.1, which addresses damage to DMT's property, only applied to "third party

18   suits . . . rather than the parties' liability to each other for damage caused" (*see* Pls. Resp.

19   at 6) would require the court to ignore the clause's broad application to "any loss, cost,

20   claim, obligation to indemnify another, suit, judgment, award, or damage" (*see, e.g.*,

21   2018 Time Charter Agreement ¶ 8.1; 2019 Time Charter Agreement ¶ 8.1).  Further, it

22   would be unreasonable to read paragraph 8.1 as not requiring DMT to indemnify AL

1    "from and against" claims of damage to the THELMA, even when the damage is caused

2    by AL, when the clause explicitly provided that DMT would indemnity AL "on account

3    of loss or damage to any of the Vessels, [DMT's] equipment and vessels . . . whether

4    caused or brought about by [AL's] negligence or any other theory of legal liability." (*See*

5    2018 Time Charter Agreement ¶ 8.1; 2019 Time Charter Agreement ¶ 8.1.)  However,

6    the court's analysis does not end here.

7            As discussed above, the Time Charter Agreements unambiguously described four

8    circumstances under which AL could be liable for damage to the THELMA, including

9    damage resulting from grounding, inadequate fendering, unsafe berth, or

10   loading/unloading.  (*See* 2018 Time Charter Agreement ¶¶ 2.7, 2.9 & Addendum ¶¶ 1-2;

11   2019 Time Charter Agreement ¶¶ 1.5, 2.7, 3.2-3.3.)  "Well-founded principles of contract

12   law establish that 'specific terms and exact terms are given greater weight than general

13   language' and that 'separately negotiated or added terms are given greater weight than

14   standardized terms . . . .'"  *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*,

15   525 F.3d 409, 420 (6th Cir. 2008) (quoting Restatement (Second) of Contracts § 203

16   (1981)).  Applying this principle and construing the Agreements' indemnity clauses "to

17   cover all losses, damages, or liabilities which reasonably appear to have been within the

18   contemplation of the parties," the court concludes that the only reasonable interpretation

19   of the Agreements is that the parties intended for those four specific circumstances to be

20   exceptions to DMT's agreement to indemnify AL for any loss or damage to the chartered

21   vessels.  (*Compare* 2018 Time Charter Agreement 8.1, *and* 2019 Time Charter

22   //

1  Agreement 8.1, *with* 2018 Time Charter Agreement ¶¶ 2.7, 2.9 & Addendum ¶¶ 1-2, *and*

2  2019 Time Charter Agreement ¶¶ 1.5, 2.7, 3.2-3.3.)

3       This conclusion holds true notwithstanding DMT's proffered interpretation of the

4  Time Charter Agreements' additional equipment/alterations and end of charter clauses as

5  imposing strict liability on AL for any damage to the vessels beyond ordinary wear and

6  tear.  Addressing the end of the charter period, the Agreements' additional

7  equipment/alterations and end of charter clauses provided as follows:

8       3.1 [AL] may . . . load and install any equipment, materials and gear and
   make alterations and additions to each Vessel incident to the service in which

9       it is to be used . . . The On-Hire Period for each Vessel shall not end until
   [AL], at its sole cost and expense, removes all such equipment, materials and

10       gear, and restores each Vessel to its condition prior to making such changes,
   ordinary wear and tear excepted.[10]

11       . . . .

12

13       Article 5 . . . The Vessels shall be redelivered to [DMT] upon termination of
   the On-Hire Periods applicable thereto at [DMT's] home port in Seattle,

14       Washington, or other such other location as agreed between the parties, in
   the same order and condition, ordinary wear and tear excepted, as when

15       accepted by [AL] . . . .

16  (2018 Time Charter Agreement ¶ 3.1 & art. 5; 2019 Time Charter Agreement ¶ 3.1 & art.

17  5.)

18       The court concludes that DMT's proposed interpretation of the terms "same order

19  and good condition" and "restore[] each Vessel" as imposing strict liability on AL for any

20  damage to the vessels beyond ordinary wear and tear is unreasonable for a number of

21       [10] While DMT's arguments mainly rely on the term "same order and condition" in article
   5 and do not substantially address the "restore" language in paragraph 3.1, the court will address

22  the language in both provisions together.  (*See* Pls. MSJ at 9-10; Pls. Reply at 2.)

1   reasons.  (*See* Pls. MSJ at 9-10; Pls. Reply at 2-4.)  First, DMT's interpretation would

2   render meaningless paragraph 8.1 and the specific exceptions making AL responsible for

3   damages caused by inadequate fendering, unsafe berth, loading/unloading, or grounding

4   because if AL was strictly liable for any damage to the vessels, paragraph 8.1 would have

5   no effect and there would be no reason to carve out exceptions to the knock-for-knock

6   indemnity clauses.  "A basic principle of contract interpretation in admiralty law is to

7   interpret, to the extent possible, all the terms in a contract without rendering any of them

8   meaningless or superfluous."  *Starrag*, 486 F.3d at 616 (quoting *Chembulk Trading LLC*

9   *v. Chemex Ltd.*, 393 F.3d 550, 555 (5th Cir. 2004)).  DMT tries to explain why its

10  interpretation would not render the clauses relating to loading/unloading, grounding,

11  fendering, and safe berth meaningless, arguing that those clauses address the "proper

12  agreed treatment of the vessels" while paragraph 3.1 and article 5 address "AL's

13  responsibly for safe return at the end of the charter period."  (*See* Pls. Reply at 4.)  The

14  court disagrees.  Consider, for example, paragraph 2.7 of the 2018 Time Charter

15  Agreement, which provided that "[AL] shall not at any time ground the THELMA.  Any

16  damage to the THELMA caused by grounding while in the sole control of [AL] will be at

17  the sole expense of and for the sole account of [AL]."  If the parties had intended AL to

18  be strictly liable for any damage to the vessels but wanted to also address the "proper

19  agreed treatment of the vessels" (Pls. Reply at 4), paragraph 2.7 could have simply read

20  "[AL] shall not at any time ground the THELMA."

21        Second, it would be unreasonable to interpret those terms as imposing strict

22  liability within the context of the entire clauses in which they appear.  *See F.W.F., Inc. v.*

1   *Detroit Diesel Corp.*, 494 F. Supp. 2d 1342, 1358 (S.D. Fla. 2007), *aff'd*, 308 F. App'x

2   389 (11th Cir. 2009) ("[T]he meaning of an unclear word or phrase should be determined

3   by the words immediately surrounding it.").  The language in paragraph 3.1 of the

4   Agreements regarding restoration of the vessels clearly relates to AL's obligation to

5   return the vessels to their initial configuration and condition at the end of the charter

6   period by removing any modifications and installed equipment, materials, and gear; it

7   does not mention any obligation for AL to repair any damage that the vessels sustained

8   during the charter period.[11]  (*See* 2018 Time Charter Agreement ¶ 3.1; 2019 Time Charter

9   Agreement ¶ 3.1.)  The "same order and condition" clause in article 5 relates to how the

10  parties would determine the end of the charter period.  (*See* 2018 Time Charter

11  Agreement art. 5; 2019 Time Charter Agreement art. 5.)

12          Third, DMT's interpretation would lead to an absurd result because it would hold

13  AL responsible for damage to the THELMA, even if DMT, who retained "exclusive

14  control and command" of the vessels' operation and navigation (*see* 2018 Time Charter

15  Agreement ¶ 1.1; 2019 Time Charter Agreement ¶ 1.4), intentionally caused the damage.

16  *See In re Fitzgerald Marine & Repair, Inc.*, 619 F.3d at 861-62 (stating that "maritime

17  law provides that construction of a maritime contract should not "lead [] to . . . absurd

18  consequences" (quoting *Chembulk Trading*, 393 F.3d at 555 n.6)).  Finally, as noted by

19  Defendants, courts have only treated language like "same condition" or "good condition"

20

21          ─────────────────

          [11] The parties agree that this case does not involve damages relating to modifications or

22  installed equipment.  (*See generally* Defs. Reply at 7 (stating the same); Pls. MSJ (lacking any
    allegations that its claims relate to modifications or installed equipment); Pls. Reply (same).)

1    as imposing strict liability on the charterer for any damage to the vessel when the charter

2    agreements also contained additional language making that obligation clear.  For

3    example, courts have imposed strict liability where the charter agreements provided that:

4    the charterer "shall be solely responsible for all loss, damage, liability . . . of any type or

5    nature whatsoever and howsoever caused arising out of or related to the [Barge] and/or its

6    use or operation during the charter term or otherwise as a result of this agreement,"

7    *Channel Constr., Inc. v. Northland Servs., Inc.*, No. C14-1231JCC, 2015 WL 9259845, at

8    *2 (W.D. Wash. Dec. 18, 2015); the charterer "assumes all risk of loss of and damage to

9    the vessel from any cause," *KAI Enters., L.L.C. v. Boh Bros. Constr. Co., L.L.C.*, 731 F.

10    Supp. 2d 568, 576 (E.D. La. 2010); and the charterer "shall be liable and responsible for

11    any and all loss and damage" to the vessel, *Sun Printing & Publ'g Ass'n v. Moore*, 183

12    U.S. 642, 655 (1902).  The Agreements here lack such language.  (*See generally* 2018

13    Time Charter Agreement; 2019 Time Charter Agreement.)  Thus, the court is unable to

14    conclude that the Agreements' "same order and condition" or "restore[] each Vessel"

15    language can be reasonably interpreted as imposing strict liability on AL for any damage

16    to the chartered vessels.

17        While DMT also relies on the Agreements' system for determining the condition

18    of the vessels before and after the charter period (*see* 2019 Time Charter Agreement art.

19    4, *with* 2018 Time Charter Agreement ¶ 4.1) to support its strict liability interpretation

20    (*see* Pls. MSJ at 9; Pls. Reply at 2), that system does not alter the court's interpretation of

21    the Agreements.  Rather, the on- and off-hire survey system is relevant to the

22    determinations of whether the vessels were damaged in a manner that imposes liability on

1   AL under the four exceptions to the knock for knock indemnity clauses, and whether AL

2   properly removed all additional equipment and restored the vessels to their pre-alteration

3   condition.

4        Accordingly, reading each provision of the Time Charter Agreements in light of

5   all others so as to give meaning to each clause, the court concludes that the Agreements

6   unambiguously provided for knock for knock indemnification regarding damage to each

7   party's property, aside from the four specifically delineated exceptions set forth therein,

8   and did not impose strict liability upon AL for damage to the vessels.

9        2.   DMT's Evidence Regarding the Cause of the Damage to the THELMA

10       Having adopted Defendants' interpretation of the Time Charter Agreements'

11  liability and indemnity provisions, the court turns to Defendants' contention that the court

12  should dismiss Plaintiffs' barge damage claims in their entirety.  Defendants argue that

13  dismissal is appropriate because DMT lacks evidence that the damage to the THELMA

14  was caused by one of the exceptions to the Time Charter Agreements' indemnity clauses.

15  (Defs. MSJ at 15-17.)  To establish that there is no genuine dispute of material fact that

16  the damage to the THELMA was not caused by inadequate fendering, unsafe berth,

17  loading/unloading, or grounding, they cite to DMT's interrogatory response and the

18  deposition of Eric Edwards, DMT's Federal Rule of Civil Procedure 30(b)(6) designee.

19  (*Id.*)  During his deposition, Mr. Edwards speculated about the cause of the damage to the

20  THELMA, but stated that he "do[es] not" know what actually caused the damage that the

21  THELMA sustained during the 2018 or 2019 charter periods.  (*See* Edwards Dep. at

22  37:11-38:4, 38:10-12, 45:3-15; *see also id.* at 38:7-8, 38:13-19 (stating that his

1    "speculation" as to the cause of the damage is "lack of safe berth").)  Similarly, DMT's

2    interrogatory response provided that it was "unaware of what specific acts or omissions

3    of AL might have caused the damage to the THELMA during the charter hire periods,

4    though the damage appears to have been sustained while the vessel was berthed or

5    docked."  (*See id.* ¶ 9, Ex. H ("DMT Rog. No. 8 Resp.").)  Defendants also rely on the

6    lack of expert testimony regarding the cause of the damage, noting that DMT has not

7    retained an expert witness and that its failure to do so means that it cannot carry its

8    burden to establish causation in this case.  (*See* Defs. MSJ at 17; Defs. Reply at 4-5.)

9         In response, DMT argues that the issue of causation is irrelevant to the question of

10   liability for barge damage under the Time Charter Agreements because Defendants are

11   strictly liable for any damage that the THELMA sustained during the time charter

12   periods.  (*See* Pls. Resp. at 3-4.)  It also cites the declaration of Mr. Daniel DeForge, the

13   manager of DMT (*see* DeForge Decl. ¶ 2), in which Mr. DeForge states that AL

14   grounded the THELMA during the charter periods.  (*See id.* at 2 (citing DeForge Decl.

15   ¶ 4).)  Further, DMT submitted a declaration from Mr. Edwards in support of its

16   response, in which he addressed the cause of the damage to the THELMA as follows:

17        Based on my knowledge of the THELMA, and of tug and barge operations
          generally, the damage sustained during the AL charters was of a type that
18        would be sustained while in port or during loading/unloading.  Specifically,
          the crushing of the side shell and internal framing can only be sustained while
19        the vessel is against or impacts another large and heavy object, and the
          damage to the bottom is consistent with grounding of the vessel.
20
21   (Edwards Decl. ¶ 12.)  Defendants characterize Mr. Edward's declaration as a "sham

22   declaration" because he already testified during his Rule 30(b)(6) deposition "that DMT

1  did not know how or when the damage occurred." (*See* Defs. Reply at 4 (citing *Kennedy*

2  *v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991)).)

3        In a maritime action for negligence or breach of contract, "the plaintiff must prove

4  that the defendant caused the resulting harm by a preponderance of the evidence." *Mullin*

5  *v. Bayline, Inc.*, No. CV 19-11028-MBB, 2021 WL 5817922, at *4-5 (D. Mass. Dec. 7,

6  2021) (citing *Pariseau v. Capt. John Boats, Inc.*, No. CIV.A. 09-10624-JGD, 2012 WL

7  527652, at *14 (D. Mass. Feb. 16, 2012)).  Here, to hold Defendants liable for the

8  damage to the THELMA under its negligence and breach of contract claims, DMT must

9  establish not only that AL caused the damage to the THELMA but also that the damage

10  was caused by one of the exceptions to the Time Charter Agreements' indemnity clauses.

11  *See id.*; *supra* Section III.B.1.

12        As the moving party, Defendants met their burden to show that there is no genuine

13  dispute of material fact and that they entitled to prevail as a matter of law on DMT's

14  barge damage claims by pointing to DMT's lack of evidence regarding an essential

15  element of those claims—namely, the cause of the damage.  (*See* Defs. MSJ at 15-17;

16  Defs. Reply at 3-5); *see also Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1106.  DMT,

17  however, failed to carry its burden to produce evidence or identify specific facts that

18  would establish a genuine dispute of material fact regarding the cause of the damage to

19  the THELMA.  *See Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.  The statements

20  in the record make clear that DMT does not know the actual cause of the damage to the

21  THELMA (*see, e.g.*, DMT Rog. No. 8 Resp.; Edwards Dep. at 37:11-38:4, 45:3-15), nor

22  //

1   have they offered any expert testimony or competent evidence to establish causation.[12]

2   DMT's reliance on Mr. DeForge's declaration for the proposition that the THELMA was

3   grounded during the charter periods is misplaced because that declaration does not offer

4   any evidence to support that allegation, nor does it attribute any of the damage identified

5   on the off-hire surveys to grounding.  (*See generally* DeForge Decl. ¶ 4.)  Moreover, to

6   the extent that Mr. Edwards's declaration can be read as offering more than speculation

7   regarding the cause of the damage to the THELMA, it is inconsistent with his deposition

8   testimony in which he stated that he did not know the cause of the damage and conceded

9   that he could only "speculate as what it was."  (*Compare* Edwards Decl. ¶ 12, *with*

10  Edwards Dep. at 37:11-38:19, 45:3-15.)  These declarations are insufficient to create a

11  triable issue of fact.  *See Kennedy*, 952 F.2d at 266 ("The general rule in the Ninth Circuit

12  is that a party cannot create an issue of fact by an affidavit contradicting his prior

13  deposition testimony."); *see also Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th

14  Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for

15  purposes of summary judgment."); *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984

16  (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is

17  insufficient to raise genuine issues of fact and defeat summary judgment."); *Villiarimo v.*

18  *Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (explaining that

19  //

20

21  _____

        [12] Because DMT has failed to produce any competent evidence regarding the cause of the
22  THELMA's damage, the court will not address the issue of whether DMT is required to produce
    expert testimony in order to establish that the damage to the THELMA was caused by inadequate
    fendering, unsafe berth, loading/unloading, or grounding.

1    "uncorroborated and self-serving" testimony without other evidence may not create a

2    genuine issue of material fact).

3         Because DMT failed to introduce sufficient evidence to raise a material dispute of

4    fact as to whether the damage to the THELMA was caused by inadequate fendering,

5    unsafe berth, loading/unloading, or grounding, the court concludes that dismissal of

6    DMT's barge damage claims in their entirety is appropriate.  *See Celotex*, 477 U.S. at 322

7    ("[A] complete failure of proof concerning an essential element of the nonmoving party's

8    case necessarily renders all other facts immaterial.").  In sum, the court DENIES DMT's

9    motion for partial summary judgment and GRANTS the portion of Defendants' motion

10   for partial summary judgment that requests dismissal of DMT's barge damage claims in

11   their entirety.

12   **C.    The Portions of DMT's Barge Damage Claims in Which DMT Seeks to
          Recover Charter Hire**

13        Alternatively, Defendants' motion asks the court to dismiss the portions of DMT's

14   barge damage claims in which DMT seeks to recover charter hire for the time it took to

15   repair the damage that the THELMA suffered during the charter periods because charter

16   hire "is not recoverable" under the Time Charter Agreements.  (*See* Defs. MSJ at 18-19;

17   Defs. Reply at 6-8.)  Because the court has granted the portion of Defendants' motion

18   that requests dismissal of DMT's barge claims in their entirety, *see supra* Section III.B,

19   the court finds it unnecessary to address Defendants' alternative argument.

20   //

21   //

22

ORDER - 28

1

**D.      Dismissal of Double EMC's Claims**

2

The final portion of Defendants' motion asks the court to dismiss the claims

3

asserted by Double EMC.  (*See* Defs. MSJ at 18-19.)  Defendants contend that "Double

4

EMC is not a proper party to this lawsuit because it was not a party to the contracts and

5

has no standing to claim damages relating to the THELMA as the vessel had been

6

bareboat chartered to DeForge at the times relevant to this dispute."  (*See id.* at 19.)  The

7

court agrees with DMT's contention that this issue is moot because the parties stipulated

8

to the dismissal of Double EMC from this action after Defendants filed their motion.

9

(*See* Stip.; 2/12/22 Order; *see also* Pls. Resp. at 12 (discussing why this issue is moot).)

10

Defendants do not dispute that this aspect of their motion is moot.  (*See generally* Defs.

11

Reply.)  Accordingly, the court DENIES as moot the portion of Defendants' motion that

12

requests dismissal of the claims asserted against them by Double EMC.

13

**IV.      CONCLUSION**

14

For the foregoing reasons, the court DENIES DMT's motion for partial summary

15

judgment (Dkt. # 30) and GRANTS in part and DENIES in part Defendants' motion for

16

partial summary judgment (Dkt. # 27).  Specifically, the court GRANTS Defendants'

17

request that the court dismiss DMT's barge damage claims and DENIES as moot

18

Defendants' request that the court dismiss the claims asserted by Double EMC.

19

//

20

//

21

//

22

//

ORDER - 29

1    Dated this 7th day of March, 2022.

2

3

4    JAMES L. ROBART
     United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22